IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

**United States of America,**

   **Plaintiff,**

**v.**                  Case No. 15-20052-01-JWL

**Nagy Shehata,**

   **Defendant.**

## MEMORANDUM AND ORDER

In June 2017, defendant Nagy Shehata pleaded guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. In September 2019, the district judge assigned to this case at the time sentenced defendant to a 32-month term of imprisonment and restitution in the amount of $8,362,200.[1]

This matter is now before the court on defendant's motion to vacate, set aside or correct his sentence under 28 U.S.C. § 2255 (doc. 197). In that motion, defendant, a citizen of Egypt and a legal permanent resident of the United States, contends that he received ineffective assistance of counsel in violation of the Sixth Amendment because his attorney provided erroneous or misleading advice regarding the immigration consequences of his guilty plea. Specifically, defendant contends that his counsel led him to believe that he would "likely avoid" deportation by entering a guilty plea and cooperating with the government when, in fact, his deportation was

---

[1] In August 2020, this court granted defendant's motion for compassionate release and placed defendant on home detention for a period of two (2) years and extended defendant's period of supervised release to a total period of three years.

presumptively mandatory as a result of his conviction. Defendant asserts that this advice fell below an objective standard of reasonableness and that he was prejudiced.

As will be explained, the motion is retained under advisement pending an evidentiary hearing to resolve pertinent factual issues raised by defendant. *See* 28 U.S.C. § 2255(b) ("Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.").

*Underlying Criminal Conduct*

During the plea colloquy between defendant and the district judge assigned to the case at that time, defendant confirmed that the following facts, as set forth in the parties' plea agreement, fairly and completely described his conduct during the relevant time period:

> Defendant Nagy Shehata is a resident of Kansas. He conducted business through Premier Investment Group, Inc., a Missouri Corporation. Shehata was the President and Kansas registered agent for the corporation. Defendant Laura Lee Sorsby is a resident of Texas. She conducted business through Can Am International. Shehata formed a joint venture partnership with Sorsby.
>
> The victim was a resident of Turkey. Victim was the founder of a hospital in Istanbul, Turkey. Victim was approached by the defendants, or others acting on the defendants' behalf, about an investment opportunity. Victim was offered an investment into a project that consisted of building a hospital in Syria, which was later changed to a shopping mall in Iraq.
>
> The defendants provided Victim with documents that falsely claimed ABN AMRO, a financial institution, was holding one billion Euros that would be used as collateral for the project. The documents were on ABN AMRO letterhead and bore signatures that purported to be from an ABN AMRO employee. However, the documents were fraudulent and ABN AMRO was not holding money for the project.

> Based upon the false statements made by the defendants, Victim agreed to provide money to invest in the project. On or about October 26, 2010, he transferred 4 million Euros (approximately $5,547,200.00 USD) to Defendant Shehata's company, Premier Investment Group. The funds were sent via wire transfer from Victim's bank account in Turkey to Defendant Shehata's bank account in New York. Defendant Shehata then wired the money from his account in New York to bank accounts in Kansas. On November 10, 2010, Victim wired 2 million Euros to Sorsby's attorney, who transferred some of the money to various accounts held in Sorby's name or Can Am International, LLC.
>
> Instead of using the money for the hospital or shopping mall projects, Shehata and Sorsby used it for personal items and sent part of the money to other conspirators. For instance, Shehata used the money to buy a new car for approximately $111,444 and spent approximately $855,388.27 of the investment on a house. Sorsby bought two new vehicles, a travel trailer and a houseboat with Victim's money.
>
> Shehata and Sorsby promised to return Victim his money by wiring the money to a third party who would reimburse the defendant.  On May 2, 2011, Shehata sent Victim an email stating the transfer would occur that day or the next.  However, despite Shehata and Sorsby's promises, they never returned any money to Victim.

Defendant swore under oath to the judge that there was nothing materially inaccurate in the factual basis supporting his guilty plea and that there was no additional information that should have been made available to the judge with respect to the factual basis for defendant's guilty plea.

*Guilty Plea and Immigration Consequences of the Plea*

As noted earlier, defendant pleaded guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.  For purposes of immigration law, this offense constitutes an "aggravated felony" because it involves fraud or deceit in which the loss to the victim or victims exceeds $10,000.  *See* 8 U.S.C. § 1101(a)(43)(M)(i).  "Any alien who is convicted of an aggravated felony at any time after admission is deportable," *see* 8 U.S.C. § 1227(a)(2)(A)(iii), and "[a]ny alien convicted of an aggravated felony shall be conclusively presumed to be deportable from the

United States," *see* 8 U.S.C § 1228(c). Upon his guilty plea, then, defendant was facing presumptive deportation.

Throughout his case, defendant was represented by an attorney from the Office of the Federal Public Defender. Defendant avers that he discussed his desire to avoid deportation with counsel on more than one occasion. According to defendant, his "primary concern" from the time he was charged in this case was to avoid removal to Egypt, which he describes as a "functional death sentence" in light of the fact that he is a Coptic Christian. Defendant avers that members of the Coptic Christian community are often violently persecuted in Egypt and, because of this, all of his immediate family and their children have left Egypt. In fact, most of his family relocated to the United States after they were granted asylum by the government here. Defendant relocated to the United States in 1985, obtained a green card, and became a lawful permanent resident in 1990. He married his wife, a natural born United States citizen, in 1999 and they remain married today.

Defendant avers that his counsel consistently advised him that his "only real chance to avoid deportation" was to plead guilty and cooperate with the government. Specifically, defendant avers that counsel "led me to believe that if I fully cooperated with the government and told them everything I knew about criminal activities then I would not be deported even if I pleaded guilty to the criminal charges against me." He states that he did not understand, and was not advised, that cooperating with the government "was far from a guaranteed way to avoid deportation" and that, in all likelihood, he would face deportation in any event. Defendant avers that "he would not have pleaded guilty if counsel had properly explained to me that even if I fully cooperated with the government I would still likely be deported to Egypt." He asserts that he

4

would have "taken my case to trial on the slim chance that I could be found not guilty by a jury" rather than enter a guilty plea that will almost certainly result in his deportation.

Defendant's counsel declined to provide an affidavit in connection with the government's response to defendant's motion. Defendant surmises that counsel perhaps believed that defendant would overcome a conclusive presumption of deportability by obtaining an S visa from the government. *See* 8 U.S.C. § 1101(a)(15)(S). It is unclear whether defendant and his attorney ever actually discussed the possibility of securing an S visa or whether counsel discussed this possibility with the government. According to defendant, the S-visa program is "incredibly limited" and no more than 200 persons each year obtain an S visa. Moreover, there is no indication in the record that the parties' plea negotiations included any promises or assurances about requesting an S visa for defendant if he cooperated.

The record reflects that removal proceedings have been initiated against defendant.

*Standard*

To establish ineffective assistance of counsel, defendant must show "that counsel's representation fell below an objective standard of reasonableness" and that he was "prejudiced by the deficient performance." *United States v. Moya*, 676 F.3d 1211, 1213 (10th Cir. 2012) (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). In *Padilla v. Kentucky*, the Supreme Court recognized that, given "the severity of deportation—the equivalent of banishment or exile ... [it is] critical for counsel to inform her noncitizen client that he faces a risk of deportation." 559 U.S. 356, 373–74 (2010) (citations omitted) (internal quotation marks omitted). In *Padilla*, the Court held that defense counsel's failure to advise a defendant of the immigration consequences

5

of a guilty plea may violate the defendant's Sixth Amendment rights and established a framework for evaluating such claims. *Id.* at 380–82.

With respect to the first prong of the *Strickland* analysis, the petitioner must prove by a preponderance of the evidence that his or her attorney did not provide objectively reasonable representation, meaning that the attorney did not accurately advise the client of the risk of deportation caused by pleading guilty. *Id*. The "nature of this mandatory advice varies depending on the complexity of the statute governing the removal consequences of the defendant's conviction." *See Whyte v. United States*, 2015 WL 4660904, at *4 (S.D.N.Y. Aug. 6, 2015). If "the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence . . . the duty to give correct advice is equally clear." *Padilla*, 559 U.S. at 369. Where it is clear that deportation is the "presumptively mandatory" consequence of a guilty plea, defense counsel must inform the client of that consequence. *Id*.

With respect to the second prong of *Strickland*, a petitioner has suffered prejudice if he or she can show that "there is a reasonable probability that, but-for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. In the plea bargain context, the "petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla*, 559 U.S. at 372. Other courts have also found prejudice where there is a reasonable probability that the petitioner could have negotiated a plea with more favorable immigration consequences. *See, e.g. Kovacs v. United States*, 744 F.3d44, 52 (2nd Cir. 2005) ("We conclude that a defense lawyer's incorrect advice about the immigration consequences of a plea is prejudicial if it is shown that, but for counsel's unprofessional errors, there was a reasonable probability that the petitioner could have negotiated

6

a plea that did not impact immigration status."); *Whyte v. United States*, 2015 WL 4660904, at *8 (S.D.N.Y. Aug. 6, 2015) (where there was no real dispute that the defendant was concerned about the immigration consequences of his guilty plea, an evidentiary hearing required to explore whether the United States Attorney's Office might have accommodated a request to structure a plea for their cooperator so that he would plead only to non-aggravated felony charges; *De Morais v. United States*, 2015 WL 2357555, at *7-8 (N.D. Cal. May 15, 2015) (defendant made a sufficient showing of prejudice where there was evidence that the parties could have constructed an "immigration-safe" plea agreement, including the entry of a guilty plea to an alternative offense).

*Deficient Performance*

Based on the record before the court, factual issues exist as to whether defendant received objectively reasonable representation. In *Padilla v. Kentucky*, 559 U.S. 356 (2010), the defendant entered a plea of guilty to transporting a large amount of marijuana. *Id*. at 359. He was a native of Honduras but also was a lawful permanent resident of the United States. *Id*. His "counsel advised him that a conviction would not result in deportation, when, in fact, it virtually ensured it." *See Souders v. Dauffenbach*, 777 Fed. Appx. 260, 266 (10th Cir. June 11, 2019). The Court agreed with the defendant that "constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation." *Padilla*, 559 U.S. at 360. In finding the defendant's counsel ineffective, the Court relied heavily on the fact that the immigration statute was "succinct, clear, and explicit in defining the removal consequences for Padilla's conviction." *Id*. at 368. As explained by the Court:

> Padilla's counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute, which addresses not some broad classification of crimes but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses. Instead, Padilla's counsel provided him false assurance that his conviction would not result in his removal from this country. This is not a hard case in which to find deficiency: The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect.

*Id*. at 368-69.

Unlike the facts of *Padilla*, defendant does not contend that this counsel assured him that conviction would not result in deportation. But the Court in *Padilla* emphasized the duty to give "correct advice" when the deportation consequence is clear. *Id*. at 369. While defendant concedes that he and his attorney discussed the immigration consequences of his guilty plea, defendant avers that counsel suggested that although deportation was possible, it was not likely if defendant cooperated with the government. In other words, defendant's submission indicates that his counsel did not advise him that deportation was presumptively mandatory. And the government does not appear to dispute that the immigration consequences of defendant's guilty plea could easily be determined from reading the removal statute such that those consequences—presumptively mandatory removal—were clear. Under *Padilla*, then, counsel was required to advise defendant of those consequences and, in the absence of an affidavit to that effect, there is nothing in the record indicating that counsel did so. In fact, the government cites no evidence contradicting defendant's description of counsel's advice, and no authority indicating that counsel's advice, as described by defendant, was adequate. Defendant, then, has established facts sufficient to require an evidentiary hearing on whether counsel's performance was objectively reasonable. *See United States v. Rodriguez-Vega*, 797 F.3d 781, 786 (9th Cir. 2015) (petitioner's

counsel was "required to advise her that her conviction rendered her removal virtually certain, or words to that effect"; advice that she faced "potential" removal was constitutionally deficient); *Whyte v. United States*, 2015 WL 4660904, at *6-7 (S.D.N.Y. Aug. 6, 2015) (evidentiary hearing required on deficient performance prong where attorney erroneously advised that although deportation was possible, it was unlikely); *De Morais v. United States*, 2015 WL 2357555, at *6-7 (N.D. Cal. May 15, 2015) (counsel's advice that defendant's immigration status would remain secure so long as the court ordered less than $10,000 in restitution was incorrect and, in the absence of any contradicting evidence from the government, was sufficient to demonstrate that he received objectively deficient representation).

*Prejudice*

The court also concludes that an evidentiary hearing is required as to whether defendant was prejudiced by counsel's advice. The government's primary argument against prejudice is that the judge assigned to this case at the time, during the Rule 11 plea colloquy, asked defendant whether he understood that his plea of guilty "may result in an order of deportation from the United States" and whether he understood this "possible" penalty as a result of pleading guilty. But the district judge's exchange with defendant was not substantively different than what his counsel advised him—that deportation was a possibility. Nothing that the judge said suggested that deportation was virtually certain. *See United States v. Akinsade*, 686 F.3d 248, 253-54 (4th Cir. 2012) (court's "equivocal" admonishment that the defendant "could be deported" during the plea colloquy did not cure counsel's deficient performance; defendant was still not advised that he faced mandatory deportation). Nothing in the plea agreement or the presentence report

suggested that deportation was virtually certain. The facts here, then, are distinguishable from the facts in *United States v. Gomez-Lugo*, 410 Fed. Appx. 148 (10th Cir. 2011), a cased relied upon by the government. In *Gomez-Lugo*, the presentence report revealed that the defendant was aware not only that he could be deported, but that he would be deported—it stated that the defendant "plans to live with family after he is deported as a result of the instant criminal conduct." *Id*. at 151.

The facts presented by defendant also distinguish this case from *United States v. Kayode*, 777 F.3d 719 (5th Cir. 2014), another case relied upon by the government. In that case, the Fifth Circuit, in a 2-1 decision, held that the defendant could not establish prejudice from his counsel's failure to advise him about the immigration consequences of his plea. *Id*. at 725. Significantly, the defendant in *Kayode* never averred that he would have gone to trial had he known about the immigration consequences of his plea. *Id*. at 726. Here, of course, defendant has submitted an affidavit in which he explains in detail that he would have proceeded to trial had he known that his plea would result in presumptive deportation. The Circuit in *Kayode* also focused on the overwhelming evidence against the defendant plus the fact that the district court judge had asked the defendant three times during his arraignment and twice at the plea hearing whether he understood that his citizenship could be revoked and that he could be deported if his citizenship was revoked. *Id*. at 726-29. There were no repeated admonishments in this case. And while defendant admits that his chances of success at trial are slim, other courts have found that when a defendant has significant familial ties to the United States and has demonstrated concern over removal, it is reasonable under the circumstances to risk going to trial and challenging the government's evidence instead of pleading guilty and facing "certain deportation." *See, e.g.,*

10

*Akinsade*, 686 F.3d at 255-56; *United States v. Rodriguez-Vega*, 797 F.3d 781, 789 (9th Cir. 2015) ("It is often reasonable for a non-citizen facing nearly automatic removal to turn down a plea and go to trial risking a longer prison term, rather than to plead guilty to an offense rendering her removal virtually certain."). The Circuit in *Kayode* did not address reasonableness through this lens and, moreover, did not address whether the defendant's counsel could have pursued an alternative plea agreement that would have protected the defendant's status. *Kayode*, then, is not persuasive to this court.

In light of his affidavit, defendant has sufficiently demonstrated that he would have proceeded to trial had he known that deportation was a virtual certainty as a result of his plea. He has lived in this country since 1985; his wife of more than 20 years lives here; and most of his immediate and extended family lives in the United States. He reasonably fears persecution in Egypt based on his faith. For these reasons, he has shown that rejecting a plea deal that would have resulted in mandatory deportation would have been reasonable. Moreover, while the parties have not addressed it, they should be prepared to address at the evidentiary hearing the nature and extent of any discussions regarding the possibility of an S visa. The government should also be prepared to address whether it has been willing to modify plea agreements to avoid immigration consequences under circumstances similar to those presented here and whether it might have been able and willing to offer defendant a different agreement at the time had the presumption of deportability been explained to him. *See Whyte*, 2015 WL 4660904, at *9.

*Summary*

Defendant has raised factual issues pertinent to both deficient performance and prejudice under *Strickland* and an evidentiary hearing is therefore required. The court will conduct a telephone status conference with the parties on **Monday, March 8, 2021 at 10:00am** for the purpose of scheduling the evidentiary hearing. Because the District's Administrative Order 2021-02 prohibits any in-person hearings until at least March 31, 2021, the parties should be prepared to discuss whether they are agreeable to a virtual evidentiary hearing prior to March 31, 2021 or whether they desire to wait until an in-person hearing is authorized in the District.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion to motion to vacate, set aside or correct his sentence under 28 U.S.C. § 2255 (doc. 197) is retained under advisement.

**IT IS SO ORDERED.**

Dated this 2nd day of March, 2021, at Kansas City, Kansas.

*s/ John W. Lungstrum*
John W. Lungstrum
United States District Judge