**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

**United States of America,**

        **Plaintiff,**

**v.**
                                              **Case No. 15-20052-01-JWL**
                                                          **20-2503-JWL**

**Nagy Shehata,**

        **Defendant.**

## MEMORANDUM AND ORDER

In June 2017, defendant Nagy Shehata pleaded guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. In September 2019, the district judge assigned to this case at the time sentenced defendant to a 32-month term of imprisonment and restitution in the amount of $8,362,200. In August 2020, the undersigned granted defendant's motion for compassionate release, placed defendant on home detention for a period of two years, and extended defendant's period of supervised release to a total period of three years.

In October 2020, defendant filed a motion to vacate, set aside or correct his sentence under 28 U.S.C. § 2255 (doc. 197). In that motion, defendant, a citizen of Egypt and a legal permanent resident of the United States, asserted that he received ineffective assistance of counsel in violation of the Sixth Amendment because his attorney provided erroneous or misleading advice regarding the immigration consequences of his guilty plea. Specifically, defendant argued that his counsel led him to believe that he would "likely avoid" deportation by entering a guilty plea and cooperating with the government when, in fact, his deportation was presumptively mandatory as

a result of his conviction.  Defendant asserts that this advice fell below an objective standard of reasonableness and that he was prejudiced.

The court retained the motion under advisement pending an evidentiary hearing to resolve pertinent factual issues raised by defendant.  A hearing was held on April 15, 2021.  Defendant was represented at the hearing by retained counsel.   Three witnesses testified—defendant Nagy Shehata; defendant's spouse Valerie Shehata; and Tom Bartee, the Federal Public Defender who represented defendant throughout his criminal proceedings.  As explained in more detail below, the court, after hearing and weighing the evidence at the hearing, finds that defendant's counsel provided adequate representation consistent with defendant's Sixth Amendment rights. Specifically, the court concludes that defendant's counsel knew that a guilty plea would result in presumptive deportation and that he imparted that knowledge to defendant prior to defendant's guilty plea while appropriately advising defendant that there was a possibility that he might avoid deportation.   Defendant's claim, then, fails at the first prong of the *Strickland* test and must be denied.


*Standard*

To establish ineffective assistance of counsel, defendant must show "that counsel's representation fell below an objective standard of reasonableness" and that he was "prejudiced by the deficient performance." *United States v. Moya*, 676 F.3d 1211, 1213 (10th Cir. 2012) (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)).  In *Padilla v. Kentucky*, the Supreme Court recognized that, given "the severity of deportation—the equivalent of banishment or exile . . . [it is] critical for counsel to inform her noncitizen client that he faces a risk of deportation."

559 U.S. 356, 373–74 (2010) (citations omitted) (internal quotation marks omitted). In *Padilla*, the Court held that defense counsel's failure to advise a defendant of the immigration consequences of a guilty plea may violate the defendant's Sixth Amendment rights and established a framework for evaluating such claims. *Id.* at 380–82.

With respect to the first prong of the *Strickland* analysis, the petitioner must prove by a preponderance of the evidence that his or her attorney did not provide objectively reasonable representation, meaning that the attorney did not accurately advise the client of the risk of deportation caused by pleading guilty. *Id*.  The "nature of this mandatory advice varies depending on the complexity of the statute governing the removal consequences of the defendant's conviction."  *See Whyte v. United States*, 2015 WL 4660904, at *4 (S.D.N.Y. Aug. 6, 2015).  If "the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence . . . the duty to give correct advice is equally clear." *Padilla*, 559 U.S. at 369. Where it is clear that deportation is the "presumptively mandatory" consequence of a guilty plea, defense counsel must inform the client of that consequence. *Id*.  The parties do not dispute that defendant's offense of conviction clearly constituted an aggravated felony and that deportation was thus presumptively mandatory.  Under *Padilla*, then, defendant's counsel was required to advise defendant that deportation was presumptively mandatory.

With respect to the second prong of *Strickland*, a petitioner has suffered prejudice if he or she can show that "there is a reasonable probability that, but-for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. In the plea bargain context, the "petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla*, 559 U.S. at 372.  Where a defendant

3

demonstrates that avoiding deportation is the determinative factor in the decision whether to accept a plea agreement, that defendant may establish prejudice by demonstrating a reasonable probability that he or she would have rejected the plea had he or she known about the deportation consequences, even if the defendant's chances of acquittal are slim. *Lee v. United States*, 137 S. Ct. 1958, 1967 (2017) (likelihood of success at trial not determinative factor for purposes of prejudice assessment; not irrational for someone facing mandatory deportation to reject a plea offer that certainly leads to deportation in favor of trial that would "almost certainly" lead to deportation).

*Factual Findings*

Defendant Nagy Shehata was born in Egypt in 1960.  After attending university in Egypt, defendant had difficulty obtaining a job and, in 1985, moved to the United States for employment. Specifically, defendant moved to California where members of his extended family lived.  In 1990, defendant became a lawful permanent resident or "green card holder."  In 1998, defendant moved to the Kansas City area to pursue an employment opportunity.  He married his wife, a natural born United States citizen, in 1999 and they have lived in the Kansas City area since that time.  Defendant, then, has lived in the United States continuously since 1985.

Defendant was raised as an active member of the Coptic Christian church and he remains a practicing Coptic Christian.  He attends church services at least once a week and is a deacon in his local church.  All members of defendant's immediate and extended family are Coptic Christians.  In 2013, after escalating threats and violence in Egypt against Coptic Christians, all of defendant's family members who had remained in Egypt sought and received asylum in the

4

United States.  According to defendant, it has become increasingly difficult to practice his religion in Egypt and Coptic Christians are often violently persecuted.  Defendant testified to his belief that, particularly because of his status in the Coptic Christian community, he would be killed if he returned to Egypt.  Defendant's religion is designated on his Egyptian passport.

In July 2015, defendant was arrested and charged with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.  Tom Bartee of the Federal Public Defender's office was appointed to represent defendant.  Mr. Bartee represented defendant at all stages of the criminal proceedings. At the evidentiary hearing, the parties focused their attention on the time frame beginning shortly before defendant entered his guilty plea on June 5, 2017.  For purposes of resolving defendant's motion, then, the court largely ignores events occurring before that time.  Defendant did not discuss his immigration status with Mr. Bartee until approximately April 2017, when he and Mr. Bartee began discussing a potential plea agreement with the government.  According to defendant, he did not raise his immigration status before that time because Mr. Bartee was in the courtroom with defendant in 2015 when defendant surrendered his Egyptian passport.  Defendant testified that he believed that Mr. Bartee knew that he was not a United States citizen because Mr. Bartee observed defendant surrender a foreign passport.

In any event, it is undisputed that Mr. Bartee had no knowledge that defendant was a green card holder until he met with defendant to discuss a plea agreement.   When Mr. Bartee learned that defendant was a green card holder, he believed that defendant's offense of conviction under the proposed plea agreement constituted an aggravated felony that would subject him to deportation (or, as Mr. Bartee testified, "presumptively removable") unless there was some avenue of relief available through the immigration court.  While defendant testified that Mr. Bartee was

"not familiar" with immigration law so they did not discuss the immigration consequences of his plea in any detail at that meeting, the court finds that Mr. Bartee, at this meeting, advised defendant about the immigration consequences of the conviction.   When asked by the court during the evidentiary hearing to state "as close as possible" what he advised defendant before he entered the plea agreement, Mr. Bartee credibly and unequivocally testified that he advised defendant "that this conviction is a crime that results in deportation absent some extraordinary circumstance."  Consistent with his testimony that he advised defendant that a guilty plea "results in deportation," Mr. Bartee also testified that defendant was "unhappy" and "concerned" when Mr. Bartee explained the immigration consequences of a guilty plea.  Defendant testified that, during this meeting, he in turn advised Mr. Bartee that staying in the United States was his "number one concern."  Defendant's testimony, then, corroborates the court's finding that Mr. Bartee advised defendant that a guilty plea "results in deportation absent some extraordinary circumstance."

On April 20, 2017, Mr. Bartee contacted Michael Sharma-Crawford, an immigration lawyer in the Kansas City area.  On that date, Mr. Bartee told Mr. Sharma-Crawford via e-mail that he had "just learned" that his client was a green card holder and that Mr. Bartee wanted to "explore options to work out the case that won't result in deportation."  Ultimately, the Office of the Federal Public Defender retained Mr. Sharma-Crawford to consult on the case.[1]  In early May 2017, Mr. Sharma-Crawford and Mr. Bartee had a discussion in which Mr. Sharma-Crawford confirmed Mr. Bartee's concern that defendant's conviction would subject him to mandatory

---

[1] Mr. Bartee did not ask Mr. Sharma-Crawford to speak with defendant at any time prior to entering the plea and did not notify defendant that he had retained Mr. Sharma-Crawford.

deportation and suggested to Mr. Bartee that he attempt to get the government to agree to permit defendant to plead guilty to a non-removable offense such as misprision or a theft-related conviction with a lower loss amount.  Mr. Bartee and Mr. Sharma-Crawford also discussed the possibility of defendant obtaining an S visa as a way "to avoid removal in the event that [Mr. Bartee] couldn't work out a plea agreement for a crime that would not be a removable offense." Mr. Bartee testified at the hearing that he understood that an S visa required a high-level law enforcement officer or prosecuting attorney to sponsor defendant and to state that defendant's continued presence in the United States was necessary for law enforcement purposes.  While an S visa is only a temporary visa, the evidence presented at the hearing demonstrates that sometimes a person can utilize an S visa to "buy time" to explore other avenues to avoid removal.

After discussing the matter with Mr. Sharma-Crawford, Mr. Bartee approached the prosecutor in this case in an effort to work out a plea to misprision.  The government declined that offer.  While Mr. Bartee could not specifically recall whether he approached the prosecutor about a plea agreement with a loss amount of less than $10,000, it is not reasonable to believe that the government would have accepted such an offer in light of the significant loss amount in this case, over $8 million.  After failing to obtain a plea offer for a non-removable offense, Mr. Bartee believed that an S visa was the "best option, post plea agreement" to avoid deportation.  As explained by Mr. Bartee at the hearing, he believed that an S visa was not possible in connection with this case because of the "short life span" of the case in terms of providing information about his co-defendant.  According to Mr. Bartee, if defendant was going to get an S visa, it was going

to be in connection with cooperation efforts in other cases, after the plea agreement was executed

in this case, and with the help of an immigration lawyer and the government.[2]

Toward that end, the plea agreement offered by the government in this case contained

defendant's agreement to cooperate with the government in the case against defendant's co-

defendant.  But defendant had also agreed to cooperate in at least two other pending prosecutions,

one in New Jersey and one in Colorado.  According to Mr. Bartee, those cases had longer life

spans than this case in terms of defendant's ability to cooperate and provide information (neither

case had gone to trial by the time of defendant's sentencing and the New Jersey case is still

awaiting trial) and the government told him that the prosecutors in those cases "wanted to get

some help from Mr. Shehata."  Mr. Bartee, then, was hopeful that defendant might be able to get

an S visa "in the future" in connection with the New Jersey or Colorado case.

The evidence reflects that Mr. Bartee and defendant then had another meeting to discuss

the plea agreement.  At that point, Mr. Bartee advised defendant that the guilty plea resulted in

removal because the conviction was an aggravated felony but that there was a possibility that if

defendant continued to cooperate in other cases he might be able to obtain an S visa after the entry

of the plea with the help of an immigration lawyer and the government.  Specifically, Mr. Bartee

testified that he told defendant that "deportation's a virtual certainty unless something like the S

---

[2] On direct examination, Mr. Bartee testified that, prior to the entry of the plea in this case, he told defendant that the plea would result in removal "unless there was some way to do something about that through an immigration attorney."  He could not recall specifically whether he advised defendant to retain or consult an immigration lawyer prior to defendant's guilty plea.  After the plea, Mr. Bartee encouraged defendant to consult with Mr. Sharma-Crawford or another immigration lawyer to "follow up" if he was "interested in doing something regarding [his] immigration status."

visa were to be used." Mr. Bartee credibly testified that he never promised defendant that he would be able to obtain an S visa. Defendant admitted that Mr. Bartee never promised that defendant would obtain an S visa and never told him that anyone had agreed to sponsor him for an S visa. In fact, defendant testified that Mr. Bartee never said whether defendant would or would not qualify for an S visa, but that Mr. Bartee told him "if you cooperate, you may be able to get the S visa."[3] This is consistent with Mr. Bartee's testimony—that an S visa was a "possibility" if he continued to cooperate with the government. Nonetheless, defendant testified he believed that if he pleaded guilty and cooperated with the government, the government would help him stay in the United States through an S visa—that is, defendant testified he believed that the S visa was not simply a possibility, but was essentially guaranteed if he cooperated.

---

[3] This testimony is not consistent with earlier testimony provided by defendant, when he testified that Mr. Bartee told him that if he cooperated with the government, then the government "would help [him] with the S visa." Defendant seemed to utilize "would" and "may" interchangeably without recognizing the substantive difference in his testimony. In any event, the court credits the version that is consistent with Mr. Bartee's testimony on this issue. The court found Mr. Bartee highly credible both because of his demeanor and his obvious candor before the court. His response to questioning from both lawyers and the court was consistent and thoughtful. In contrast, defendant appeared to shade his testimony in a way that he thought would be beneficial to him at the hearing. By way of example, defendant testified that avoiding removal was his top priority in connection with the criminal proceedings generally and in assessing the plea specifically, but he did not mention the fact that he was a green card holder to Mr. Bartee until nearly two years into the criminal proceedings. Mr. Bartee testified credibly that while defendant certainly was concerned about the immigration consequences of his plea, he was primarily concerned with shortening his prison time and never told Mr. Bartee that he feared for his life or feared religious persecution if he returned to Egypt. Defendant's spouse also testified that in fact she was primarily concerned with the immigration consequences of the plea but that defendant was primarily concerned with prison time. When the court also considers that defendant was convicted of a crime of dishonesty, the court finds that defendant was not a credible witness on key issues and, as a result, simply does not believe defendant's testimony that Mr. Bartee told him that he "would" help him obtain a visa.

Defendant entered a guilty plea on June 5, 2017.  After defendant entered his plea, Mr. Bartee encouraged defendant to consult with Mr. Sharma-Crawford or another immigration lawyer regarding defendant's immigration status.  Defendant was sentenced in September 2019 and ordered to voluntarily surrender when notified by the U.S. Marshals Service.  In late November 2019, defendant received a letter indicating that he would be serving his sentence at the Giles Dalby Correctional Institution in Post, Texas and that he had been designated as "deportable."  At that point, defendant and his wife, for the first time, contacted an immigration lawyer for assistance in avoiding deportation.  The record reflects that removal proceedings have been initiated against defendant.

*Conclusions of Law*

As noted earlier, defendant pleaded guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.  For purposes of immigration law, this offense constitutes an "aggravated felony" because it involves fraud or deceit in which the loss to the victim or victims exceeds $10,000.  *See* 8 U.S.C. § 1101(a)(43)(M)(i).  "Any alien who is convicted of an aggravated felony at any time after admission is deportable," *see* 8 U.S.C. § 1227(a)(2)(A)(iii), and "[a]ny alien convicted of an aggravated felony shall be conclusively presumed to be deportable from the United States," *see* 8 U.S.C § 1228(c).  Upon his guilty plea, then, defendant was facing presumptive deportation.

The starting point for evaluating defendant's counsel's performance in this case is *Padilla v. Kentucky*, 559 U.S. 356 (2010).  In *Padilla*, the defendant entered a plea of guilty to transporting a large amount of marijuana.  *Id*. at 359.  He was a native of Honduras but also was a lawful

permanent resident of the United States. *Id.* His "counsel advised him that a conviction would not result in deportation, when, in fact, it virtually ensured it." *See Souders v. Dauffenbach*, 777 Fed. Appx. 260, 266 (10th Cir. June 11, 2019). The Court agreed with the defendant that "constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation." *Padilla*, 559 U.S. at 360. In finding the defendant's counsel ineffective, the Court relied heavily on the fact that the immigration statute was "succinct, clear, and explicit in defining the removal consequences for Padilla's conviction." *Id*. at 368. As explained by the Court:

> Padilla's counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute, which addresses not some broad classification of crimes but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses. Instead, Padilla's counsel provided him false assurance that his conviction would not result in his removal from this country. This is not a hard case in which to find deficiency:  The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect.

*Id*. at 368-69.

In the court's prior memorandum and order granting an evidentiary hearing, the court indicated that, under *Padilla*, Mr. Bartee was required to advise defendant that his guilty plea would subject him to presumptively mandatory removal. After observing and considering Mr. Bartee's testimony, the court finds that testimony credible and believes that Mr. Bartee provided this advice to defendant before defendant entered his plea. The real question, however, is whether Mr. Bartee's suggestion that there was a possibility that defendant could obtain an S visa and thereby avoid deportation painted a sufficiently unrealistic picture of the immigration consequences of defendant's plea that it amounted to affirmative misadvice under *Padilla*. *See*

*United States v. Castro-Taveras*, 841 F.3d 34, 42-43 (1st Cir. 2016) ("There is no question . . . that *Padilla*'s holding encompasses both misadvice and non-advice claims."). As will be explained, the court concludes that Mr. Bartee's advice about the possibility of defendant obtaining an S visa did not run afoul of *Padilla* and did not constitute deficient performance under the Sixth Amendment.

The court has uncovered only a handful of cases with facts sufficiently analogous to the facts here to be helpful to the issue of whether defendant's counsel satisfied his duty under *Padilla*. Of that handful, the court finds two cases to be particularly persuasive—*United States v. Cazarez-Santos*, 66 F. Supp. 3d 1301 (S.D. Cal. 2014) and *United States v. Fazio*, 2011 WL 6780926 (W.D. Pa. Dec. 27, 2011). In *Cazarez-Santos*, the defendant pled guilty to an aggravated felony that subjected him to presumptive removal. 66 F. Supp. 3d at 1303. After an evidentiary hearing on the defendant's § 2255 motion, the court found that the defendant's trial counsel advised the defendant prior to the plea that he would "definitely" be in deportation proceedings, and that he would more than likely be deported, although deportation was not absolutely certain because he could not rule out the possibility that the defendant might avoid deportation. *Id*. at 1304-05. In essence, trial counsel advised his client, "never say never." *Id*. at 1304. As highlighted by the court, the defendant's counsel explained

> that it would be irresponsible of him to tell a client that there was no chance at all of avoiding deportation, because sometimes it can be avoided. For example, he testified that a client might be eligible for asylum or for what he called a "snitch visa," under which the client avoids deportation by providing assistance to the government. [Trial counsel] also testified that he routinely advises his clients that they should hire an immigration attorney if they are intent on avoiding deportation, and he tries not to provide detailed immigration advice himself.

*Id.*

12

In analyzing whether the defendant's trial counsel gave correct advice under *Padilla*, the district court began by noting that *Padilla* "does not establish a particular quantum of certainty by which the clarity or thoroughness of defense counsel's advice should be measured." *Id*. at 1307. Against that backdrop, the court determined that defense counsel, who are not typically also immigration attorneys, are not expected to "predict with absolute precision how an immigration court would rule on a given case." *Id*. at 1309. Concluding that the defendant's counsel satisfied *Padilla*, the court summarized:

> Attorneys are supposed to give reasonable, balanced advice that permits their clients to make informed decisions. They are not required nor expected to provide the direst warnings possible, or to give uniform warnings to every client according to an established script. There are a number of ways non-citizen defendants who plead guilty to aggravated felonies can avoid deportation. If attorneys are universally required to advise clients that they were "virtually certain" to be deported, most defendants would undoubtedly accept that advice as true, and as a result some would be dissuaded from taking advantage of favorable provisions of law that might exempt them from deportation. Others might effectively be coerced by excessively dire earnings into going to trial when, in fact, pleading guilty is their best option.

*Id*. (citations omitted). Ultimately, the court held that the defendant's counsel's advice that "deportation was likely though not completely certain" was competent and provided a more complete picture of the consequences that his client was facing. *Id*. at 1310.

Similarly, in *Fazio*, the defendant pled guilty to an aggravated felony that subjected him to presumptive removal. 2011 WL 6780926, at \*5. The defendant's counsel advised his client prior to entry of the plea that while there would be immigration consequences, he would be entitled to a hearing before an immigration court and that he was "confident" that with "competent immigration counsel . . . that he stood a good chance of not being deported." *Id*. at \*3. After entering a guilty plea, the defendant hired an immigration lawyer, who advised him that there was

13

no reasonable possibility of avoiding deportation. *Id*. at *6. The defendant then filed a motion to withdraw his guilty plea, arguing that this counsel painted an unrealistic picture of the immigration consequences of his plea. *Id*. at *8.

During an evidentiary hearing on the defendant's subsequent motion to withdraw his guilty plea, the defendant's immigration lawyer "conceded, although hesitantly, that it was possible for someone who was convicted of the identical crime that defendant was convicted of to remain in the country if the person was provided with an S visa." *Id*. at *6. He testified that he was aware that the defendant's plea agreement reflected the defendant's commitment to cooperate with the government in his case and potentially other cases and that he was not familiar with the procedures of the government to know the timing of when an S visa might be offered by the government. *Id*. Nonetheless, the immigration lawyer testified that he "rarely" saw S visas being offered. *Id*. at *6 n.3. Based in large part on this testimony, the court denied the defendant's motion to withdraw his guilty plea. *Id*. at *9. In doing so, the court emphasized that *Padilla* does not require "an attorney to advise his client of an absolute certainty of deportation at the plea stage." *Id*. at *8. The court essentially found that trial counsel's advice that his client would be entitled to a hearing and "stood a chance" of avoiding deportation was proper. *Id*. at *9.

Turning back to this case, Mr. Bartee advised defendant that his guilty plea would almost certainly result in removal because the conviction was an aggravated felony but that there was a possibility that if defendant continued to cooperate in other cases he might be able to obtain an S visa after the entry of the plea with the help of an immigration lawyer and the government. Like the courts in *Cazarez-Santos* and *Fazio*, this court concludes that such advice clearly satisfied *Padilla* and, moreover, that defendant's counsel appropriately advised defendant that he stood a

chance of avoiding removal if he continued to cooperate and if he sought help from an immigration lawyer.   Counsel's advice that defendant might be able to avoid deportation was particularly reasonable under the facts of this case—where defendant had agreed to cooperate with the government and agents in other cases had expressed an interest in getting help from defendant. By not limiting his advice to the fact that deportation was virtually certain, and by including in his advice the possibility of an S visa, counsel provided defendant with the full range of facts on which to base his decision to plead guilty.   Mr. Bartee's advice was reasonable, balanced, and clearly satisfies the Sixth Amendment's right to counsel.   *See also United States v. Roman,* 2015 WL 12857313, at *7 (D. Colo. Aug. 27, 2015) ("[T]here are a number of situations in which non-citizen defendants who plead guilty to aggravated felonies can avoid removal, and criminal defense attorneys do not know with certainty how an immigration judge will handle a case. Therefore, criminal defense attorneys cannot be expected to precisely and accurately quantify the probability of removal in each particular case."); *United States v. Mancebo*, 2014 WL 3385071, at *2, *4 (M.D. Pa. July 9, 2014) (attorney did not provide affirmative misadvice concerning deportation where attorney accurately distinguished between the certainty of deportation proceedings occurring and predictions about the likelihood of actual removal as a result of those proceedings).

Notably, the facts of this case are distinct from the facts in *United States v. Abou-Khodr*, 2013 WL 4670856 (E.D. Mich. Aug. 30, 2013), another case that involved discussions about obtaining an S visa.  In that case, the district court granted the defendant's motion for a writ of error coram nobis after finding that the defendant's counsel had falsely promised him that if he pleaded guilty and cooperated with the government, he would not be deported.  The defendant's

counsel averred that he had "assured" his client, based on numerous discussions with the government, that he would remain in the United States despite his guilty plea. *Id*. at \*6. Specifically, the government had promised, in exchange for the defendant's cooperation, to support an asylum petition, the issuance of a material witness warrant, and/or the issuance of an S visa. *Id*. at \*1. Even though the court found that those promises were made in good faith and without any intention to mislead the defendant, the court held that the defendant would not have pleaded guilty but for his attorney's false assurances that he would not be deported. *Id*. at \*8. Unlike the situation in *Abou-Khodr*, there is no evidence before the court that anyone made any promises or assurances about defendant's ability to remain in the United States after a guilty plea. Mr. Bartee credibly testified that he "never" promised defendant that he would be able to obtain an S visa and even defendant concedes that no such promises were made. He never suggested that removal was unlikely or that obtaining an S visa was likely.  There is simply no credible evidence before the court that counsel made false assurances to defendant about the likelihood of obtaining an S visa.  Thus, even if defendant genuinely believed (which, as noted earlier, the court doubts) that obtaining an S visa or otherwise avoiding removal was a near-guarantee, that belief was not reasonable based on the evidence before the court and the advice that Mr. Bartee provided.

For the foregoing reasons, the court concludes that counsel's performance was not deficient and that he satisfied his duty under *Padilla* to give correct advice concerning the immigration consequences of defendant's guilty plea.  Because the court concludes that defendant's counsel was not ineffective, the court declines to address *Strickland*'s second prong. *United States v. Hollis*, 552 F.3d 1191, 1194 (10th Cir. 2009).

Lastly, under Rule 11(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts, a "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Under 28 U.S.C. § 2253(c)(2), this court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." Such a showing is made only when "a prisoner demonstrates 'that jurists of reason would find it debatable' that a constitutional violation occurred, and that the district court erred in its resolution." *United States v. Pinson*, 584 F.3d 972, 975 (10th Cir. 2009) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Defendant has not made a substantial showing of the denial of a constitutional right. Therefore, a certificate of appealability is denied.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion to vacate, set aside or correct his sentence under 28 U.S.C. § 2255 (doc. 197) is **denied** and the court **denies a certificate of appealability**.

**IT IS SO ORDERED.**

Dated this 28th day of April, 2021, at Kansas City, Kansas.

*s/ John W. Lungstrum* _
John W. Lungstrum
United States District Judge

17